# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

JAMES R. WILLIS,                                    1:09-cv-01703-AWI-GSA-PC

             Plaintiff,          FINDINGS AND RECOMMENDATIONS,
                                                    RECOMMENDING THAT DEFENDANTS'
   v.                                             MOTION TO DISMISS BE GRANTED IN
                                                    PART
HARLEY G. LAPPIN, et al.,                           (Doc. 43.)

          Defendants.          OBJECTIONS, IF ANY, DUE IN THIRTY
                                                    DAYS

_____/

## I.     RELEVANT PROCEDURAL HISTORY

James R. Willis ("Plaintiff") is a federal prisoner proceeding pro se and in forma pauperis in this civil rights action pursuant to Bivens vs. Six Unknown Agents, 403 U.S. 388 (1971) and the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671-2680.  Plaintiff filed the Complaint commencing this action on September 28, 2009.  (Doc. 1.)  The case now proceeds with the Third Amended Complaint filed on July 8, 2011, against defendant United States for negligence under the FTCA; and against defendants Warden Dennis Smith, Associate Warden Belinda Avalos, Lieutenant ("Lt.") Cobb, Lt. Paul, Unit Manager Devere, Unit Manager Mrs. Bowles, Case Manager Liwag,[1] and Associate Warden Carolyn Gant for failure to protect Plaintiff, in violation of the Eighth Amendment.[2]  (Doc. 24.)

_____

[1]In the Third Amended Complaint, Plaintiff spelled this defendant's name as Li Wag.  3ACP at 2. Defendant has corrected the spelling to Liwag.  Motion, Doc. 43-1 at 24 ¶4.

[2]To date, defendant Gant has not been served with process or appeared in this action. (Doc. 35.)

1

1    On June 20, 2012, Defendants filed a motion to dismiss the Third Amended Complaint under

2    Rule 12(b)(6) for failure to state a claim, to dismiss Plaintiff's negligence claims under Rule 12(b)(1)

3    for want of subject matter jurisdiction, to dismiss Plaintiff's <u>Bivens</u> claims based on qualified

4    immunity,  and to dismiss defendant Gant under Rule 12(b)(5) for failure to effect service.  (Doc.

5    43.)  On July 16, 2012, Plaintiff filed an opposition to the motion.  (Docs. 47, 48.)  On August 20,

6    2012, Defendants filed a reply to the opposition.  (Doc. 51.)  Defendants' motion to dismiss is now

7    before the Court.

8    **II.    MOTION TO DISMISS – RULE 12(b)(6)**

9    A motion to dismiss pursuant to Rule 12(b)(6) operates to test the sufficiency of the

10   complaint.  The first step in testing the sufficiency of the complaint is to identify any conclusory

11   allegations.  <u>Ashcroft v. Iqbal</u>, __ U.S. __, 129 S.Ct. 1937, 1950 (2009).  "Threadbare recitals of the

12   elements of a cause of action, supported by mere conclusory statements, do not suffice."  <u>Id.</u> at 1949

13   (citing <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007)).  "[A] plaintiff's obligation to provide

14   the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic

15   recitation of the elements of a cause of action will not do."  <u>Twombly</u>, 550 U.S. at 555 (citations and

16   quotation marks omitted).  Although the court must accept well-pleaded factual allegations of the

17   complaint as true for purposes of a motion to dismiss, the court is "not bound to accept as true a legal

18   conclusion couched as a factual allegation."  <u>Id.</u>

19   After assuming the veracity of all well-pleaded factual allegations, the second step is for the

20   court to determine whether the complaint pleads "a claim to relief that is plausible on its face."

21   <u>Iqbal</u>, 129 S.Ct. at 1949, 1950 (citing <u>Twombly</u>, 550 U.S. at 556, 570) (rejecting the traditional

22   12(b)(6) standard set forth in <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957)).  A claim is facially

23   plausible when the plaintiff "pleads factual content that allows the court to draw the reasonable

24   inference that the defendant is liable for the misconduct alleged."  <u>Id.</u> at 1949 (citing <u>Twombly</u>, 550

25   U.S. at 556).  The standard for plausibility is not akin to a "probability requirement," but it requires

26   "more than a sheer possibility that a defendant has acted unlawfully."  <u>Id.</u> (citing <u>Twombly</u>, 550 U.S.

27   556).

28   ///

III.     SUMMARY OF THE THIRD AMENDED COMPLAINT

Plaintiff is currently incarcerated at the United States Penitentiary in Tucson, Arizona ("USP-Tucson").  The events at issue in the Third Amended Complaint allegedly occurred at the United States Penitentiary in Atwater, California ("USP-Atwater"), while Plaintiff was incarcerated there. Plaintiff names as defendants Warden Dennis Smith, Associate Warden Belinda Avalos, Associate Warden Carolyn Gant, Lieutenant Cobb (Special Investigation Supervisor ("SIS")), Lieutenant Paul, Mr. Devere (Unit Manager for Buildings 4A, 5A, and 5B), Mrs. Bowles (Unit Manager for Building 6), Mr. Li Wag (Case Manager), and the United States.

Plaintiff alleges as follows in the Third Amended Complaint.

On April 15, 2007, Plaintiff was assaulted at the United States Penitentiary in Victorville, California ("USP-Victorville") and was subsequently transferred to USP-Atwater.   It was documented in Plaintiff's Central File that he was assaulted because of his sex-offender label.

On June 12, 2007, upon arrival at USP-Atwater, Plaintiff was interviewed by defendant Lt. Cobb.  Plaintiff told defendant Cobb about his assault at USP-Victorville due to his status as a sex-offender and told Cobb that he had at least one known enemy at USP-Atwater.  Defendant Cobb acknowledged that he was aware of Plaintiff's history and knew Plaintiff's enemy, Kenneth Mattox. Defendant Cobb placed Plaintiff in the Special Housing Unit ("SHU"), pending an investigation.

On June 14, 2007, Plaintiff spoke to his case manager, defendant Wag, explained his situation, and gave him a Cop-Out (written request) explaining his safety concerns.  Defendant Wag did not respond to the Cop-Out.

On June 21, 2007, Plaintiff spoke to defendant Warden Smith about his situation.  Warden Smith told Plaintiff that when the investigation was concluded, a decision would be made whether to transfer Plaintiff.

In late June or early July of 2007, Plaintiff explained his situation to defendant Unit Manager Devere. Defendant Devere told Plaintiff that he would contact SIS Lt. Cobb about the investigation. Defendant Devere told Plaintiff he was going on sick leave, and defendant Bowles would be handling his caseload during his absence.

///

On July 7, 2007, Plaintiff wrote a letter to Regional Director Robert McFadden, explaining his situation. The letter was received by McFadden on July 12, 2007. A copy was forwarded to Warden Smith. On August 13, 2007, Warden Smith responded that the investigation was completed, the threat against Plaintiff was unverified, and Plaintiff would be released into the General Population. SIS never interviewed Plaintiff while he was in the SHU. Upon receipt of this information, Plaintiff sought a transfer and enlisted his mother's assistance. Plaintiff's mother called and spoke to defendants Wag and Devere, reiterating Plaintiff's safety concerns and pleading for a transfer, but the transfer was not granted. She wrote at least four letters, two to Mr. McFadden, one to Harley Lappin (Director of the BOP), and one to Warden Smith, during August and September 2007. These letters were sent down the chain of command to Warden Smith, defendant Devere, and defendant Wag, and placed in Plaintiff's Central File.

In August 2007, Plaintiff wrote a Cop-Out to defendant Wag, requesting a transfer and reminding Wag of his safety concerns.

On August 17, 2007, Plaintiff wrote Cop-Outs to Warden Smith, conveying his concerns that the threat against him was determined to be unverified. Plaintiff explained the history of threats against him due to his sex-offender status and told the Warden that he feared for his life if forced into the General Population. Plaintiff knew that USP-Atwater was a very violent and dangerous prison controlled by gangs, and that inmates labeled as sex offenders or snitches were routinely assaulted.

On August 17, 2007, Plaintiff wrote a Cop-Out to defendant Bowles about his known enemy, Kenneth Mattox, and the threats against Plaintiff. Plaintiff handed the Cop-Out to Bowles, who assured Plaintiff she would look into this matter, but she never responded to the Cop-Out. A record of this Cop-Out is in Plaintiff's Central File.

Associate Warden Gant responded to the Cop-Out Plaintiff sent to Warden Smith. Plaintiff spoke to Gant on at least three occasions, during her routine visits to the SHU, informing her of the threat that existed against him.

On August 24, 2007, Associate Warden Avalos responded to Plaintiff's mother's correspondence, on Warden Smith's behalf. Avalos stated that the threat against Plaintiff was not substantiated, but USP-Atwater staff had decided to transfer Plaintiff. No such transfer occurred.

4

In September 2007, Plaintiff spoke to Associate Warden Avalos and told her that the SIS Department had not come to see him about the investigation since his placement in the SHU, and that he was not scheduled for transfer. Plaintiff told her of his safety concerns and asked for the investigation to be reopened. Avalos said she would look into the matter, but Plaintiff did not receive a new investigation or a transfer.

On September 14, 2007, Plaintiff filed a BP-8 informal resolution form with his Unit Counselor Mr. Putnam, requesting administrative remedies. The BP-8 form was never responded to. Plaintiff proceeded to file a BP-9 form, Log number #466507-F1, with defendants Wag and Devere, explaining his safety concerns and requesting a transfer. The BP-9 form was rejected because the BP-8 form was not attached as required, even though a BP-9 form of a serious or life threatening nature should be processed without completion of a BP-8 informal resolution.

On September 19, 2007, Plaintiff spoke to defendant Lt. Paul in Paul's office about his safety concerns, and Paul agreed that if Plaintiff's allegations were true, Plaintiff would be in danger in the General Population. Although Plaintiff pleaded with Lt. Paul to place him on Protective Custody status, Lt. Paul told Plaintiff he would be ordered to the General Population, and if he refused the order, he would receive incident reports for refusing to program.

On September 25, 2007, Plaintiff was ordered to leave the SHU and was placed in the General Population. Plaintiff was approached by several gang members who told him that Kenneth Mattox was waiting to see him. Plaintiff met with Mattox, who was accompanied by several other gang members, without incident. On September 26, 2007, Plaintiff again encountered Mattox, who was accompanied by six other inmates. Mattox told Plaintiff there was a rumor that Plaintiff was a "RAPO" (imprisoned on a sex offense), and Plaintiff had three weeks to produce paperwork disproving it. Immediately after this confrontation, Plaintiff spoke to his Unit Manager defendant Devere and told him about the conversation with Mattox. Devere took no action to protect Plaintiff.

On October 9, 2007, during the noon meal, Plaintiff was attacked and brutally assaulted by six inmates, while inmate Mattox acted as a lookout. There were no correctional officers present on the sidewalk at the time of the assault. The assault occurred in plain view of Housing Units 6A and 6B, the Lieutenants Office, and the Central Yard tower, but staff did not assist Plaintiff. Plaintiff

was severely beaten for three to five minutes, and kicked and stomped with hard-toed boots. Plaintiff's head was severely swollen and misshapen, his left eye was swollen completely shut, his nose was broken, his left sinus cavity was fractured, and he had deep lacerations on his scalp and multiple scrapes and contusions all over his body.  Plaintiff was taken to Mercy Medical Center in Merced, California, and required corrective surgery to repair his face.  Plaintiff also suffered a concussion.

Plaintiff continues to have headaches, blurred vision, and dizzy spells.  Plaintiff also suffers from panic attacks, paranoia, and violent nightmares as a result of the attack.

## IV.   PLAINTIFF'S CLAIMS

### A.   Negligence Claims – Federal Tort Claims Act (FTCA)

Plaintiff brings a negligence claim under the FTCA, 28 U.S.C. §§ 1346(b), 2671-2680, which waives the sovereign immunity of the United States for certain torts committed by federal employees.  FDIC v. Meyer, 114 S.Ct. 996, 1000 (1994).

### *Negligence*

The elements of a negligence claim are duty, breach of duty, proximate cause, and damages. Minch v. Department of California Highway Patrol, 140 Cal.App.4th 895, 900-01 (Cal. App. 2006). Plaintiff alleges that the United States owed him a duty to protect him from being assaulted and breached that duty due to the negligent acts or omissions of its agents, the Defendants.  Plaintiff alleges that Defendants failed to investigate Plaintiff's repeated requests for protective custody, failed to transfer Plaintiff, failed to monitor the movement of inmates at the time Plaintiff was assaulted, failed to process Plaintiff's prison grievance, failed to notice indicators that an assault was about to occur, and failed to render assistance to Plaintiff while he was being assaulted.  Plaintiff alleges that as a result of Defendants' conduct, he suffered serious injuries.

The Court found that Plaintiff states a claim for negligence against the United States for the conduct of defendants Smith, Avalos, Cobb, Paul, Devere, Bowles, Wag, and Gant.  (Doc. 29.)

### B.   Bivens Claims

A Bivens action is the federal analog to suits brought against state officials under 42 U.S.C. § 1983.  Hartman v. Moore, 547 U.S. 250, 126 S.Ct. 1695 (2006).  Plaintiff alleges that individual

1  prison employees at USP-Atwater violated his constitutional rights, which suggests a <u>Bivens</u> claim

2  against federal officers. <u>Iqbal</u>, 129 S.Ct. at 1947-48 (citing <u>Bivens</u>, 403 U.S. 388, 91 S.Ct. 1999

3  (1971)); <u>Correctional Serv. Corp. v. Malesko</u>, 534 U.S. 61, 66, 122 S.Ct. 515, 519 (2001); <u>Pollard

4  v. GEO Group, Inc.</u>, 629 F.3d 843, 854 (9th Cir. 2010). A <u>Bivens</u> claim is only available against

5  officers in their individual capacities, <u>Morgan v. U.S.</u>, 323 F.3d 776, 780 n.3 (9th Cir. 2003);

6  <u>Vaccaro v. Dobre</u>, 81 F.3d 854, 857 (9th Cir. 1996), and Plaintiff must allege facts linking each

7  named defendant to the violation of his rights, <u>Iqbal</u>, 129 S.Ct. at 1948; <u>Simmons v. Navajo

8  County,Ariz.</u>, 609 F.3d 1011, 1020-21 (9th Cir. 2010); <u>Ewing v. City of Stockton</u>, 588 F.3d 1218,

9  1235 (9th Cir. 2009); <u>Jones v. Williams</u>, 297 F.3d 930, 934 (9th Cir. 2002). The factual allegations

10  must be sufficient to state a plausible claim for relief, and the mere possibility of misconduct falls

11  short of meeting this plausibility standard. <u>Iqbal</u>, 129 S.Ct. at 1949-50; <u>Moss v. U.S. Secret Service</u>,

12  572 F.3d 962, 969 (9th Cir. 2009).

13  ### _Eighth Amendment Claim - Failure to Protect_

14  In 1980, the Supreme Court held that a federal inmate could bring suit for money damages

15  against federal prison officials under the Eighth Amendment. <u>Carlson v. Green</u>, 446 U.S. 14, 24,

16  100 S.Ct. 1468, 64 L.Ed.2d 15 (1980). The Eighth Amendment protects prisoners from inhumane

17  conditions of confinement. <u>Morgan v. Morgensen</u>, 465 F.3d 1041, 1045 (9th Cir. 2006). Although

18  prison conditions may be restrictive and harsh, prison officials must provide prisoners with food,

19  clothing, shelter, sanitation, medical care, and personal safety. <u>Farmer v. Brennan</u>, 511 U.S. 825,

20  832-33, 114 S.Ct. 1970 (1994) (internal citations and quotations omitted). Prison officials have a

21  duty to take reasonable steps to protect inmates from physical abuse, <u>Id.</u> at 833; <u>Hearns v. Terhune</u>,

22  413 F.3d 1036, 1040 (9th Cir. 2005), and the failure of prison officials to protect inmates from

23  attacks by other inmates may rise to the level of an Eighth Amendment violation where prison

24  officials know of and disregard a substantial risk of serious harm to the plaintiff, e.g., <u>Farmer</u>, 511

25  U.S. at 847; <u>Hearns</u>, 413 F.3d at 1040.

26  The Court found that Plaintiff states cognizable claims against defendants Smith, Avalos,

27  Cobb, Paul, Devere, Bowles, Wag, and Gant for failure to protect him, in violation of the Eighth

28  Amendment. (Doc. 29.)

1    **V.      DEFENDANTS' MOTION TO DISMISS**

2         Defendants seek to dismiss the Third Amended Complaint under Rule 12(b)(6) for failure

3    to state a claim, to dismiss Plaintiff's negligence claims under Rule 12(b)(1) for want of subject

4    matter jurisdiction, to dismiss Plaintiff's <u>Bivens</u> claims based on qualified immunity, and to dismiss

5    defendant Gant under Rule 12(b)(5) for failure to effect service.

6         **A.      Rule 12(b)(1) - Subject Matter Jurisdiction**

7         Defendants argue that the Court lacks subject matter jurisdiction over Plaintiff's negligence

8    claims under the FTCA, because the prison officials' actions are protected by the discretionary

9    function exception ("DFE").

10        "Federal courts are courts of limited jurisdiction." <u>Kokkonen v. Guardian Life Ins. Co.</u>, 511

11   U.S. 375, 377, 114 S.Ct. 1673, 1675 (1994).  The district courts "have original jurisdiction of all

12   civil actions arising under the Constitution, laws, or treaties of the United States. 28 U.S.C. § 1331.

13   Rule 12(b)(1) of the Federal Rules of Civil Procedure permits dismissal for lack of subject matter

14   jurisdiction. Fed. R. Civ. P. 12(b)(1).

15        ***Discretionary Function Exception of the FTCA***

16        The FTCA, 28 U.S.C. §§ 1346(b), 2671-2680, waives the sovereign immunity of the United

17   States for certain torts committed by federal employees.  <u>Meyer</u>, 114 S.Ct. at 1000.  "That waiver,

18   however, is limited." <u>Alfrey v. United States</u>, 276 F.3d 557, 561 (9th Cir. 2002).   Liability cannot

19   be imposed if the tort claims stem from a federal employee's exercise of 'discretionary function.'"

20   <u>Id.</u> "[T]he discretionary function exception provides an exception to the waiver of immunity from

21   suit under the FTCA for '[a]ny claim based on an act or omission of an employee of the Government,

22   exercising due care, in the execution of a statute or regulation, whether or not such statute or

23   regulation be valid, or based upon the exercise or performance or the failure to exercise or perform

24   a discretionary function or duty on the part of a federal agency or an employee of the Government,

25   whether or not the discretion involved be abused.' 28 U.S.C. § 2680(a)." <u>Green v. U.S.</u>, 630 F.3d

26   1245 (9th Cir. 2011).  "The discretionary function exception . . . marks the boundary between

27   Congress' willingness to impose tort liability upon the United States and its desire to protect certain

28   governmental activities from exposure to suit by private individuals." <u>United States v. S.A. Empresa</u>

de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 808, 104 S.Ct. 2755 (1984) (discretionary function exception barred airline action against the government for negligent aircraft inspection).  See also Berkovitz v. United States, 486 U.S. 531, 536, 108 S.Ct. 1954 (1988) (discretionary function exception did not bar plaintiffs' FTCA action against the United States Food and Drug Administration for negligent approval of public release of polio vaccine).  If the discretionary function exception applies, the court lacks subject matter jurisdiction. Alfrey, 276 F.3d at 561.

The Supreme Court applies a two-part test to determine whether an act is discretionary and falls within the discretionary function exception to the FTCA.  See Berkovitz, 486 U.S. at 536-37. First, the court must "determine whether a federal statute, regulation, or policy mandated a specific course of action, or whether the government actor retained an element of judgment or choice with respect to carrying out the challenged action. Green, 630 F.3d at 1249 (citing Terbush v. U.S., 516 F.3d 1125 (9th Cir. 2008).   "If the government action did involve choice or judgment, the second step is to determine 'whether that judgment is of the kind that the discretionary function exception was designed to shield, namely, only governmental actions and decisions based on considerations of public policy.'"  Id.  The focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis." U.S. v. Gaugert, 499 U.S. 315, 325, 111 S.Ct. 1267, 1174 (1991).  Because "[t]he basis for the discretionary function exception was Congress' desire to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy," the exception "protects only governmental actions and decisions based on considerations of public policy." Berkovitz, 486 U.S. at 536-37 (internal quotation marks omitted).  "When a statute, regulation, or agency guideline allows a government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." Alfrey, 276 F.3d at 562 (internal citations omitted).  "If the challenged action satisfies both of these two prongs, that action is immune from suit -- and federal courts lack subject matter jurisdiction -- even if the court thinks the government abused its discretion or made the wrong choice." Green at 1249-50 (citing Terbush at 1125).

1    When the Government moves to dismiss for lack of subject matter jurisdiction under Rule

2    12(b)(1) on the ground that the actions complained about involve discretionary functions, the court

3    may consider the challenged pleadings, as well as jurisdictional facts supplied by affidavit,

4    declaration, or other evidence properly before the court. <u>Green</u>, 630 F.3d at 1248 n. 3.  The party

5    asserting subject matter jurisdiction usually bears the burden of establishing proper jurisdiction.  <u>See</u>

6    <u>Thornhill Publ'g Co., Inc. v. Gen. Tel. & Elecs. Corp.</u>, 594 F.2d 730, 733 (9th Cir.1979).  However,

7    when the discretionary function exception is invoked, the Government bears the burden of

8    establishing that the exception applies.  <u>See</u> <u>Navarette v. United States</u>, 500 F.3d 914, 916 (9th Cir.

9    2007); <u>Whisnant v. United States</u>, 400 F.3d 1177, 1181 (9th Cir.2005); <u>Bear Medicine v. United</u>

10   <u>States ex rel. Sec'y of the Dep't of the Interior</u>, 241 F.3d 1208, 1213 (9th Cir.2001).

11           **1.    Defendants' Position**

12   Defendants argue that Plaintiff's negligence claims should be dismissed because prison

13   officials granted Plaintiff's request for protective custody and used their discretion to investigate his

14   claims and ultimately denied his request for a transfer, all of which is protected by the DFE.

15   Defendants identify four alleged failures of prison officials to act being challenged by Plaintiff:  (1)

16   failure to protect Plaintiff from attackers, (2) failure to properly respond to a threat made to Plaintiff

17   by another inmate, (3) failure to transfer Plaintiff to another facility, and (4) failure to have adequate

18   staff supervising the area where Plaintiff was assaulted.  Defendants argue that the DFE applies to

19   each of these alleged failures to act because the governing statutes and regulations allow for

20   discretion by prison officials, and case law supports the application of the DFE.

21           With respect to prison officials' duty to protect the safety of inmates, Defendants maintain

22   that 18 U.S.C. § 4042 imposes a general duty of care to safeguard prisoners but provides the Bureau

23   of Prisons ("BOP") with sufficient discretion to trigger the DFE.  Defendants argue that applicable

24   regulations in effect in 2007 regarding the use of Protective Custody, 28 C.F.R., §§ 541.22 and

25   541.23, further demonstrate, by indicating that prison officials "may" take particular actions in

26   response to safety concerns, the discretion afforded staff in dealing with protection of inmates.

27   Defendants also cite cases which have applied the DFE to BOP decisions not to place inmates in

28   protective custody, and to officials' failure to discover and prevent inmate attacks.

With respect to prison officials' duty to respond to known threats against inmates, Defendants argue that 28 C.F.R. § 541.10 allows staff discretion in utilizing inmate discipline to dissuade a potential assault after learning of a threat, by its language, "Staff shall take disciplinary action *at such times and to the degree necessary* to regulate an inmate's behavior within . . . Bureau rules and institution guidelines and to promote a safe and orderly institutional environment." 28 C.F.R. § 541.10 (emphasis added). Defendants also cite cases holding that regulations provide BOP staff with discretion in determining how to respond to an alleged threat by one inmate against another, and that the government was protected by the DFE in using its discretion not to separate one inmate from another.

With respect to BOP decisions whether to transfer an inmate from one facility to another, Defendants argue that applicable regulations lay out the BOP's discretion, in particular Paragraph 2(a) of the Program Statement 5100.08 which states that "[E]ach inmate will be placed in a facility commensurate with their security and program needs through an objective and consistent system of classification which also allows staff to exercise their professional judgment." (Declaration of Troy A. Dorrett, Doc. 43-2, Exh. A.)

Finally, with respect to the duty to assign adequate staff to supervise inmates, Defendants cite Mitchell v. United States, 149 F. Supp.2d 1111 (D. Arizona 1999), in which a federal inmate was assaulted when four other inmates entered his cell, and then did not receive any aid from staff until he regained consciousness and made his way to a staff member's office. The court in Mitchell decided that under the DFE, the court lacked subject matter jurisdiction over the plaintiff's claim for negligence in failing to have adequate staff supervising the area, noting that "[D]ecisions by governmental officials as to the day-to-day security needs of a prison, including the number of guards to employ to supervise a given area . . . are judgment calls and choices based on policy determinations that seek to accommodate 'safety [goals] and the reality of finite agency resources.'" Mitchell at 1114 (quoting Varig Airlines, 467 U.S. at 820.

///

///

///

11

## 2.    Plaintiff's Position

The Court now looks to Plaintiff's opposition which contains Plaintiff's declaration signed under penalty of perjury, filed on July 16, 2012, and the verified Third Amended Complaint.[3]

Plaintiff first argues that pursuant to United States v. Gaubert, 499 U.S. 315, 327, 111 S.Ct. 1267, 1276 (1991), Defendants' evidence in support of their motion to dismiss should be excluded, or the motion should be converted to a Rule 56 motion for summary judgment.

With respect to the allegations that Defendants failed to investigate Plaintiff's requests for protective custody, Plaintiff argues that Defendants cannot just assert that they conducted an investigation, in the hopes of invoking the DFE as a defense.

With respect to the allegations that Defendants failed to process Plaintiff's administrative remedy, Plaintiff argues that the DFE does not apply because the Program Statement governing administrative remedies provides that when an inmate submits an administrative remedy of a serious or life threatening nature, such remedy should be processed even if it is procedurally deficient, and Defendants did not follow the policy.

With respect to the allegations that there was not sufficient staff supervising inmates, Plaintiff argues that his factual allegations infer that when Plaintiff was assaulted, there was not enough staff present because the officers may not have been at their posts, in which case Defendants are not entitled to immunity under the DFE.

## 3.    Defendants' Reply

In reply, Defendants argue that the first part of the two prong DFE test is met – that the challenged conduct must be discretionary – because Plaintiff cites no statute, regulation, or policy that specifically prescribes a course of action that was not followed.  With respect to the alleged failure to process Plaintiff's administrative remedy because he had not attempted informal resolution, Defendants argue that applicable regulations, 28 C.F.R §§ 542.13(a), (b), expressly show that the decision whether to waive the informal resolution step is discretionary, by the language "may be

---

[3]As discussed above, when the Government moves to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) on the ground that the actions complained about involve discretionary functions, the court may consider the challenged pleadings, as well as jurisdictional facts supplied by affidavit, declaration, or other evidence properly before the court. Green, 630 F.3d at 1248 n. 3.

waived ... at the discretion of the Warden or Institution Administrative Remedy Coordinator." <u>See</u> 28 C.F.R. § 542.13(b).

With respect to Plaintiff's speculation that prison officials may not have been at their posts during the assault, Defendants argue that Plaintiff has no evidence of this and his speculation requires an unwarranted inference, which the courts are not required to indulge. Defendants assert there is no requirement that BOP post guards in position to see every prisoner movement, and Plaintiff's claims that staff were not present challenges the discretionary decision of how to deploy limited resources to provide for the safe and secure operation of the facility.

With respect to Plaintiff's allegations that prison officials failed to respond to a report of a threat against Plaintiff, Defendants assert that federal regulations expressly give prison officials discretion in how to respond to reports of threats by inmates, and it must be presumed that their choices were based in public policy.

Defendants contend that Plaintiff incorrectly argues that Defendants' evidence should be excluded and the motion to dismiss should be converted to a summary judgment motion, because it is well established that a challenge to jurisdiction under Rule 12(b)(1) "can be either facial, confining the inquiry to allegations in the complaint, or factual, permitting the court to look beyond the complaint." <u>Savage v. Glendale Union High Sch. Dist. No. 205</u>, 343 F.3d 1036, 1039-40, fn. 2 (9th Cir. 2003). Defendants assert that because they have converted the motion into a factual motion by presenting evidence, Plaintiff is now required to furnish evidence to satisfy his burden of establishing subject matter jurisdiction. Thus, Defendants argue that because Plaintiff has not presented any factual evidence to establish jurisdiction and because the DFE applies, all of the FTCA claims must be dismissed.

### 4.   <u>Discussion</u>

As a threshold issue, the Court finds that Defendants' motion was properly brought as a motion to dismiss. Plaintiff's argument, that Defendants' motion must be converted to a motion for summary judgment because Defendants have submitted evidence in support of the motion, is without merit. As Defendants have argued, it is well established that a challenge to jurisdiction under Rule 12(b)(1) "can be either facial, confining the inquiry to the allegations in the complaint, or factual,

permitting the court to look beyond the complaint." <u>Savage</u>, 343 F.3d at 1039-1040, fn. 2.  A motion to dismiss for lack of subject matter jurisdiction may either attack the allegations of the complaint or may be made as a "speaking motion" attacking the existence of subject matter jurisdiction in fact. <u>Land v. Dollar</u>, 330 U.S. 731, 735 & n.4, 67 S.Ct. 1009 (1947).  Where the jurisdictional issue is separable from the merits of the case, the judge may consider the evidence presented with respect to the jurisdictional issue and rule on that issue, resolving factual disputes if necessary.  <u>Berardinelli v. Castle & Cooke, Inc.</u>, 587 F.2d 37 (9th Cir. 1978); <u>Sinclair v. Spatocco</u>, 452 F.2d 1213 (9th Cir. 1971), cert. denied, 409 U.S. 886, 93 S.Ct. 102 (1972).

It is Defendants' burden to show that the DFE applies to shield them from liability under the FTCA for the acts, or omissions to act, alleged against them.  <u>See</u> <u>Navarette</u>, 500 F.3d at 916; <u>Whisnant</u>, 400 F.3d at 1181; <u>Bear Medicine</u>, 241 F.3d at 1213.  Plaintiff alleges in the Third Amended Complaint that Defendants were negligent in failing to act to remove a threat to Plaintiff's safety, resulting in Plaintiff being assaulted by other inmates.  Specifically, Plaintiff alleges that Defendants (1) failed to adequately investigate his complaints that he was in danger of harm from a known enemy, (2) failed to transfer him to another prison away from the danger, (3) failed to monitor movement of inmates to keep Plaintiff's known enemy away from him, (4) failed to process Plaintiff's administrative remedy, (5) failed to respond to a known threat against Plaintiff, and (6) failed to render assistance to Plaintiff when he was being assaulted.

In order to determine whether the BOP's decisions involved discretionary acts, the court must examine the statutes and regulations which governed the decisions and determine whether they set forth a mandatory, non-discretionary action which the BOP was required to take under the circumstances.  If the conduct violates the statute or regulation, it is not shielded by the DFE because such an action is mandatory, not discretionary.  If the statute or regulation allows employee discretion, there is a strong presumption that the discretionary act involves consideration of the public policies which led to passage of the law.  The Court looks at the nature of the actions and whether the decisions were of a public policy character.  The intent of the actor does not matter.

Central to the issues in this case are the following statutes, regulations, and policies identified by Defendants:

1    **18 U.S.C. § 3621(b)** provides, in pertinent part, that "[T]he Bureau of Prisons shall designate

2    the place of the prisoner's imprisonment. The Bureau may designate any available penal or

3    correctional facility that meets minimum standards of health and habitability established by the

4    Bureau, whether maintained by the Federal Government or otherwise and whether within or without

5    the judicial district in which the person was convicted, that the Bureau determines to be appropriate

6    and suitable, considering the resources of the facility contemplated; the nature and circumstances of

7    the offense; [or] the history and characteristics of the prisoner. . . [T]he Bureau may at any time,

8    having regard for the same matters, direct the transfer of a prisoner from one penal or correctional

9    facility to another."  18 U.S.C. § 3621(b)(1), (2), (3), (5).

10   This statute governs the BOP officers' decisions about where Plaintiff should be housed,

11   whether at USP-Atwater or another available correctional facility, and whether he should be

12   transferred to another facility.  Thus, this statute governs Defendants' decision whether to transfer

13   Plaintiff to another facility based, in part, on Plaintiff's "history and characteristics," including his

14   safety concerns.  By its language "The Bureau *may* designate," "that the Bureau *determines* to be

15   appropriate . . *considering* [multiple factors]," and "The Bureau *may* at any time, *having regard for*

16   *the same matters*, direct the transfer of a prisoner . . ," this statute clearly allows employees

17   discretion to decide at which facility an inmate should be housed and whether the inmate should be

18   transferred elsewhere depending on the circumstances.

19   **18 U.S.C. § 4042** provides, in part, that "[T]he Bureau of Prisons, under the direction of the

20   Attorney General, shall . . . provide suitable quarters and provide for the safekeeping, care, and

21   subsistence of all persons charged with or convicted of offenses against the United States [and]

22   provide for the protection, instruction, and discipline of all persons charged with or convicted of

23   offenses against the United States."   18 U.S.C. § 4042(a)(2), (3).

24   This statute governs the BOP officers' decisions about Plaintiff's housing placement at the

25   prison, whether he should be single-celled, double-celled, place in protective custody, or placed in

26   the General Population.  It governs decisions about whether to place Plaintiff in protective housing

27   based on his belief there was a threat against him,  whether Plaintiff's known enemy, inmate Kenneth

28   Mattox, should have been removed from General Population after Plaintiff reported the conversation

15

between Mattox and Plaintiff, and whether further investigation into Plaintiff's safety concerns should have been conducted.  Because the statute does not mandate specific courses of action, it gave the officers discretion to use their judgment in carrying out the actions involved in investigating the threats against Plaintiff, placing Plaintiff in the General Population, and allowing inmate Mattox to remain in the General Population.

Moreover, it has been widely held that this statute creates only a general duty of care to safeguard prisoners, and does not preclude the BOP from exercising judgment in the manner in which it chooses to fulfill that duty.  See Cohen v. United States, 151 F.3d 1338, 1342 (11th Cir.1998); see also Calderon v. United States, 123 F.3d 947, 950–51 (7th Cir.1997); Graham v. United States, 2002 WL 188573, at *4 (E.D.Pa. Feb. 5, 2002).  Because the action taken under this statute involves choice by the acting government employee, the first prong of the two-part test for determining whether the DFE bars an FTCA claim is satisfied for this statute.

Courts have also held that the duty of care set out in this statute involves public policy considerations because the need for protection must be balanced with other needs such as providing inmates with the right to circulate within the prison.  Graham, 2002 WL 188573 aff'd, (3d Cir. 2002) 47 Fed.Appx. 198 (citing see Calderon, 123 F.3d at 951.)  Thus, the second prong, whether the choice afforded the employee is "of a kind that the DFE was designed to shield," namely whether the decisions were based on considerations of public policy, is also satisfied for this statute.

**28 C.F.R. § 541.10** provides that "[S]taff shall take disciplinary action at such times and to the degree necessary to regulate an inmate's behavior within . . . Bureau rules and institution guidelines and to promote a safe and orderly institution environment."  28 C.F.R. § 541.10.

This regulation governs the BOP officers' decisions about whether disciplinary action should have been taken against inmate Mattox or other inmates when Plaintiff reported his encounters in General Population, and whether Mattox should have been segregated from the General Population or otherwise separated from Plaintiff based on threatening behavior.  The statute uses the language "shall take disciplinary action *at such times and to the degree necessary* to regulate an inmate's behavior," which gives officers discretion in deciding when and how to act in disciplining inmates, using "rules and institution *guidelines*," with the goal of *"promot[ing]  a safe and orderly []*

*environment*."   Because the regulation allows for discretion in the officers' decisions, with the presumption that their decisions were based on considerations of promoting a safe and orderly environment, both parts of the two-part test are satisfied, and the DFE applies to Plaintiff's FTCA claims challenging the BOP officers' acts under this regulation.

**28 C.F.R., §§ 541.22** defines administrative detention status as "an administrative status which removes you from the general population when necessary to ensure the safety, security, and orderly operation of correctional facilities, or protect the public.  Administrative detention status is non-punitive, and can occur for a variety of reasons."  28 C.F.R., §§ 541.22

This regulation governs, in part, the BOP officers' decisions about whether Plaintiff should have been housed in protective custody by his placement in administrative detention.  The regulation does not mandate specific acts, but rather allows discretion for officers to determine "*when [it is] necessary* to ensure the safety, security, and orderly operation" of the facility . . . "*for a variety of reasons*."

By its language, this regulation allows discretion in making decisions about when administrative detention should be used, satisfying the first part of the DFE test.  The second part of the test, public policy consideration, is also satisfied by a reading of the statute itself, presuming that the decisions taken under the regulation are "to ensure the safety, security and orderly operation of the facility."  Thus the DFE applies to Defendants' acts pursuant to this regulation challenged by Plaintiff.

**28 C.F.R., § 541.23** addresses the reasons an inmate "may be placed in administrative detention status," which includes removal from general population when an inmate's "presence in the general population poses a threat to life, property, self, staff, other inmates, the public, or to the security or orderly running of the institution, and for protection, when the inmate "requested, or staff determined [he] need[s] administrative detention status for [his] own protection.  28 C.F.R., § 541.23(c).

This regulation governs, in part, the BOP officers' decisions whether to place Plaintiff in administrative detention or remove him from the General Population, to protect him from threats to his safety, and whether to detain inmate Mattox or other inmates in administrative detention in

response to Plaintiff's belief of a threat against him and Plaintiff's report of the encounter between Plaintiff and other inmates on the yard.  Its language, "*may* be placed in administrative detention status," allows the BOP discretion to decide how to react to a threat posed by an inmate or a request by an inmate for protection.  Thus, the first part of the DFE test is met for this regulation.

The Supreme Court has not directly addressed the DFE's application to federal prisoners' FTCA claims for injuries by fellow inmates.  However, the federal circuits that have reviewed such claims have uniformly held they are barred by the discretionary function exception.  See, e.g., Cohen, 151 F.3d 1338; Dykstra v. United States Bureau of Prisons, 140 F.3d 791 (8th Cir.1998) (discretionary function exception applied to prison officials' failure to warn plaintiff his youthful appearance might make him vulnerable to attack and failure to place him in protective custody upon complaint that fellow inmate was staring at him); Calderon, 123 F.3d 947 (discretionary function exception applied to prisoner's FTCA claim for government's negligent failure to prevent an attack on him by his cellmate); Buchanan v. United States, 915 F.2d 969 (5th Cir.1990) (discretionary function exception applied to prisoners' FTCA claim for damages sustained while prisoners were held hostage by Cuban detainees during a prison uprising); see also Scrima v. Hasty, No. 97–8433, 1998 WL 661478 (S.D.N.Y.1998) (discretionary function exception applied to prisoner's claim of officials' alleged negligence for allowing another inmate to exercise outside plaintiff's cell when the other inmate entered plaintiff's cell and assaulted him); Green v. U.S., Civ. A. No. 94–5706, 1995 WL 574495 (E.D.Pa.1995) (prisoner's FTCA claim based on sexual assault by cellmate with a history of sexual violence dismissed); Barrett v. United States, 845 F.Supp. 774 (D.Kan.1994) (FTCA claim based on BOP's failure to investigate a series of incidents allegedly leading to inmate's death dismissed for lack of subject matter jurisdiction).  Based on this record, the Court finds that the DFE applies to the officers' acts under this regulation challenged by Plaintiff.

**28 C.F.R § 542.13** addresses the Informal Resolution level of the Administrative Remedy procedure: "(a) Informal resolution. Except as provided in § 542.13(b), an inmate shall first present an issue of concern informally to staff, and staff shall attempt to informally resolve the issue before an inmate submits a Request for Administrative Remedy. Each Warden shall establish procedures to allow for the informal resolution of inmate complaints. (b) Exceptions.  Inmates in CCCs are not

required to attempt informal resolution. An informal resolution attempt is not required prior to submission to the Regional or Central Office as provided for in § 542.14(d) of this part. An informal resolution attempt may be waived in individual cases at the Warden or institution Administrative Remedy Coordinator's discretion when the inmate demonstrates an acceptable reason for bypassing informal resolution. 28 C.F.R §§ 542.13(a), (b).

This regulation governs the BOP officers' decision whether to allow Plaintiff's administrative remedy to proceed without the B-8 form (informal resolution) attached. The regulation allows for exceptions to the requirement for an inmate to attempt informal resolution before submitting a Request for Administrative Remedy, but it does not mandate a specific course of action for "individual cases." Instead, it provides that an "informal resolution attempt *may* be waived in individual cases when the inmate demonstrates an acceptable reason," giving the officers discretion in deciding when a reason is acceptable to allow the inmate to bypass the informal resolution step. Thus, the first part of the DFE test, whether officers are allowed discretion in their decisions, is met.

The decisions made in processing administrative remedies under this regulation involve social public policy considerations, such as whether prisons have established fair and uniform procedures to be applied to all inmates with grievances. Thus, the second part of the DFE test is met, and the DFE is applicable to the officers' actions pursuant to this regulation.

Paragraph 2(a) of the **Program Statement 5100.08**, Security Designation and Custody Classifications Manual, governs the transfer of inmates: "Each inmate will be placed in a facility commensurate with their security and program needs through an objective and consistent system of classification which also allows staff to exercise their professional judgment . . ."

This policy statement governs the BOP officers' decision whether to transfer Plaintiff to another facility because of alleged threats to his safety. The policy clearly allows the officers discretion in their decisions, by its language "allows staff to exercise their professional judgment."

With respect to BOP officers' placement within the prison to supervise inmates, Defendants cite Mitchell, a district court case within the Ninth Circuit, which held that "[D]ecisions by governmental officials as to the day-to-day security needs of a prison, including the number of guards to employ to supervise a given area . . . are judgment calls and choices based on policy

1   determinations that seek to accommodate 'safety [goals] and the reality of finite agency resources.'"

2   Mitchell at 1114 (quoting Varig Airlines, 467 U.S. at 820.

3       The court must presume that when a statute, regulation, or agency guideline permits a BOP

4   officer to exercise discretion, the officer's acts are grounded in policy when exercising that

5   discretion. Gaubert, 499 U.S. at 324, 111 S.Ct. 1267.  Moreover, decisions about where staff should

6   be assigned on the prison grounds involves several public policy considerations including the

7   weighing of where inmates requiring assistance are housed, where conflicts between inmates might

8   arise, and the assessment of budgetary and economic considerations.  These are the types of

9   decisions that Congress intended to shield from liability through the DFE.

10      Plaintiff's argument that the DFE does not apply because he inferred, in his allegations, that

11  the officers were negligently absent from their assigned posts is unpersuasive.  The Court did not

12  find any such inference in Plaintiff's allegations.  Even if Plaintiff intended to make such an

13  inference, he has not supported the allegations with any facts.  At most, Plaintiff's allegations that

14  the officers were negligent in being absent from their posts are speculative and need not be

15  considered by the Court.

16      Based on the foregoing analysis, the Court finds that all of the Defendants' acts challenged

17  by Plaintiff under the FTCA were discretionary, and the decisions made by the Defendants were

18  grounded in public policy, namely assuring the safety and security of inmates, efficiently managing

19  the prison, and providing a process for inmates to request administrative remedies.  Therefore, the

20  Court finds that Defendants are entitled to dismissal of Plaintiff's FTCA claims against them, for

21  lack of subject matter jurisdiction.

22      **B.    Qualified Immunity**

23      Defendants argue that Plaintiff's Bivens claims are barred by qualified immunity.

24      The qualified immunity analysis is the same for § 1983 claims against state officials and

25  Bivens claims against federal officials.  Johnson v. Fankell, 520 U.S. 911, 914-15, 117 S.Ct. 1800,

26  138 L.Ed.2d 108 (1997).  Government officials enjoy qualified immunity from civil damages unless

27  their conduct violates "clearly established statutory or constitutional rights of which a reasonable

28  person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738 (1982).

"Qualified immunity balances two important interests - the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably," Pearson v. Callahan, 555 U.S. 223, 231, 129 S.Ct. 808, 815 (2009), and protects "all but the plainly incompetent or those who knowingly violate the law," Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096 (1986).

In resolving a claim of qualified immunity, courts must determine whether, taken in the light most favorable to the plaintiff, the defendant's conduct violated a constitutional right, and if so, whether the right was clearly established. Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 2156 (2001); McSherry v. City of Long Beach, 560 F.3d 1125, 1129-30 (9th Cir. 2009). While often beneficial to address in that order, courts have discretion to address the two-step inquiry in the order they deem most suitable under the circumstances. Pearson, 129 S.Ct. at 818 (overruling holding in Saucier that the two-step inquiry must be conducted in that order, and the second step is reached only if the court first finds a constitutional violation); McSherry, 560 F.3d at 1130. In determining whether the law was clearly established, the Court's inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." Saucier, 533 U.S. at 201.

With respect to the first prong of Saucier, at this stage on a motion to dismiss, the Court is bound by federal notice pleading standards and must take Plaintiff's allegations as true. Plaintiff has alleged that his safety was endangered by the presence of enemy inmates in the General Population, that Defendants were aware the danger existed, and that Defendants nonetheless exposed Plaintiff to the danger, leading to Plaintiff's serious injuries. At this stage, Plaintiff's allegations are sufficient to show that Defendants Smith, Avalos, Cobb, Paul, Devere, Bowles, Liwag, and Gant's conduct violated a constitutional right. Saucier, 533 U.S. at 201; see Cunningham v. Gates, 229 F.3d 1271, 1289 (9th Cir. 2000) (an officer can be held liable for failing to intercede if he had a "realistic opportunity" to intercede).[4] Therefore, the first prong of Saucier has been met.

///

---

[4]On November 30, 2011, the Court entered an order finding that the Third Amended Complaint stated cognizable claims against defendants Smith, Avalos, Cobb, Paul, Devere, Bowles, Wag, and Gant, for failure to protect Plaintiff, in violation of the Eighth Amendment. (Doc. 29.)  For purposes of the motion to dismiss, Defendants have not disputed the facts or the Court's finding that Plaintiff states cognizable claims.

With respect to the second prong of Saucier, the Court first looks to the laws governing Defendants' conduct at the time of the events at issue and whether the law in effect was clearly established. Plaintiff alleges that the events at issue occurred between June 12, 2007 and October 9, 2007. Therefore, the Court looks to the law that was in effect before and during that time period.

In Farmer, the Supreme Court made clear that there is a governmental obligation to "protect prisoners from violence at the hands of other prisoners," and the assault of one inmate by another can violate the Constitution. Farmer, 511 U.S. 825. To be deliberately indifferent, the defendants must "know" of the risk to the plaintiff but be indifferent and unresponsive to it. Farmer, at 842. This is a subjective test which is surely met if the defendant is shown to be aware of the risk to the inmate and then fails to respond to it.

By 2007, numerous cases in the Ninth Circuit had defined what constitutes deliberate indifference by prison officials to a risk to inmates' safety: Allen v. Sakai, 48 F.3d 1082, 1087 (9th Cir.1994), cert. denied, 115 S.Ct. 1695 (1995) (to establish liability for deliberate indifference to the safety of inmates, an inmate must show that there was a sufficiently serious risk of harm and that prison officials knew of the risk of harm); Fisher v. Stewart, 37 Fed. Appx. 947 (9th Cir. 2002) (prison official was not deliberately indifferent to inmate's safety where official did not learn until afterward of a substantial risk of harm to the inmate); Estate of Ford v. Ramirez-Palmer, 301 F.3d 1043, 1052 (9th Cir. 2002) (prison officials did not violate plaintiff's Eighth Amendment rights by celling him with inmate who had an "extraordinary history of violence" because the two inmates were previously housed together without incident and the cellmate had not recently acted aggressively toward others); Greene v. Hudson, 67 Fed. Appx. 477, 478 (9th Cir. 2003) (dismissal of Greene's Eighth Amendment failure to protect claim because Greene failed to allege facts demonstrating the defendant knew of and disregarded threats or actual harassment by other inmates based on Greene's having been labeled a "drop out."); Hearns, 413 F.3d 1036 (inmate's pro se complaint sufficiently alleged facts detailing religiously motivated violence to state § 1983 claim that prison officials failed to protect him from attacks by other inmates in violation of his Eighth Amendment rights; inmate alleged that officials knew that numerous Muslim inmates had been

1  subject to attack by ruling Muslim group in chapel); Byerly v. Deputy Warden (9th Cir. 2007) 246

2  Fed. Appx. 512 (assuming attack on inmate by fellow prisoners constituted a significantly serious

3  deprivation of inmate's rights, there was no evidence that acting director of the Arizona Department

4  of Corrections was aware of likelihood of attack, after prisoner sought and was denied placement

5  in protective segregation because he was a sex offender).  Thus, by 2007 the law was settled, and

6  when the decision was made to place Plaintiff in the General Population yard, "it would have been

7  clear to a reasonable official that if he knew about an excessive risk to inmate safety, and inferred

8  from the facts of which he was aware that a substantial risk of serious harm exists, he would violate

9  the law by disregarding it."  Estate of Ford, 301 F.3d at 1051 (citing Farmer, 511 U.S. at 835, 838).

10  However, the Court must also consider whether, under the circumstances specific to the present

11  action, reasonable officers in Defendants' positions would have clearly understood that the risk of

12  serious harm was so high they should have acted to protect Plaintiff.

13      Defendants cite Estate of Ford, 301 F.3d at 1049, in which the Ninth Circuit considered the

14  interaction between the Eighth Amendment failure to protect claim and qualified immunity,

15  recognizing that the subjective part of the test "does not fit easily with the qualified immunity

16  inquiry," observing that:

17

18      [A] reasonable prison official understanding that he cannot recklessly disregard a
        substantial risk of serious harm, could know all of the facts yet mistakenly, but
        reasonably, perceive that the exposure in any given situation was not that high.  In

19      these circumstances, he would be entitled to qualified immunity.

20  Id. at 1051.  Defendants also cite Berg, in which the Ninth Circuit held that more than a mere

21  suspicion that an attack will occur is required for an Eighth Amendment claim of failure to protect.

22  Berg v. Kincheloe, 794 F.2d 457, 459 (9th Cir. 2000; accord Chappell v. Stankorb, 2012 WL

23  1413889, *2 (E.D. Cal. Apr. 23, 2012) (a presently existing actual threat must be shown, although

24  the injury need not be certain to occur).  Defendants argue that no reasonable officer would have

25  known that their conduct was unlawful when responding to generalized safety concerns like those

26  presented by Plaintiff, especially where the threat had been investigated but could not be verified.

27  ///

28

Defendants also argue that each of the BOP Defendants could have reasonably believed that his or her particular conduct was lawful under the circumstances.

Plaintiff argues that each of the defendants was aware of the specific threat against him and also of the out-of-control and violent conditions at USP-Atwater at the time Plaintiff was assaulted. Plaintiff asserts that he was very specific about his safety concerns, notified Defendants of the fact that he had been assaulted at USP-Victorville due to his state sex conviction, identified at least one known enemy, and told officials that he believed he was targeted to be assaulted by other inmates. Plaintiff argues that experienced officials, such as Defendants, would have known about the dangerous conditions at the prison and would have understood that an inmate labeled as "RAPO," such as Plaintiff, would be more vulnerable and likely to be assaulted.

The Court shall discuss the circumstances of each of the individual Defendants, specific to Plaintiff's case, in turn.

**Defendant Lieutenant Cobb**

Plaintiff alleges that he was transferred to USP-Atwater because he was assaulted on April 15, 2007 by inmates at USP-Victorville because of his sex-offender label.  3ACP at 10 ¶2.  The reason for his transfer was documented in his Central File.  Id.  On June 12, 2007, upon his arrival at USP-Atwater, Plaintiff was interviewed by the Special Investigation Supervisor, defendant Lt. Cobb.  Id. at 10 ¶3.  Plaintiff told Lt. Cobb about his previous difficulties and informed Lt. Cobb that he feared he was targeted for assault by various gangs and that he had at least one known enemy at USP-Atwater, inmate Kenneth Mattox.  Id. at 10-11 ¶3.  Plaintiff told Lt. Cobb that Mattox was a member of the Aryan Circle prison gang and knew Plaintiff from the United States Penetentiary at Pollock, Louisiana ("USP-Pollock") where Plaintiff had problems.  Declaration of James Willis ("Willis Decl."), Doc. 48 at 29-30.  Lt. Cobb stated that he was aware of Plaintiff's recent troubles in 2006 at USP-Pollock and the assault at USP-Victorville, resulting from Plaintiff's sex-offender label.  3ACP at 11 ¶4.  Plaintiff told Lt. Cobb that he was very concerned because USP Atwater was a California yard, and the California Aryan Brotherhood could easily plan to attack him, and that he was in fear for his life.  Willis Decl. at 30.  Lt. Cobb housed Plaintiff in protective custody in the

1  SHU, pending a threat assessment investigation. 3ACP at 11 ¶5.  The investigation was completed

2  on August 3, 2007, finding that the threats against Plaintiff were unverified.  Id. at 12 ¶10.  Plaintiff

3  remained in the SHU until September 25, 2007, when he was ordered to leave.  Id. at 19 ¶25.

4  Plaintiff makes no further allegations against defendant Cobb.

5      Thus, according to Plaintiff, Lt. Cobb acted on his knowledge about Plaintiff's prior assault

6  and Plaintiff's known enemy at USP-Atwater, placed him in protective custody, and ordered an

7  investigation, which resulted in a finding that the threats against Plaintiff at USP-Atwater were

8  unverified.  Plaintiff alleges no further contact with Lt. Cobb.

9      The Court finds that under these facts, a reasonable person in Lt. Cobb's position would not

10  have been aware that Plaintiff was at risk of serious injury if he did not act to further protect Plaintiff,

11  or that his failure to act was unlawful.  Therefore, defendant Cobb is entitled to dismissal of the

12  Bivens claims against him, based on qualified immunity.

13      **Defendant Liwag (Case Manager)**

14      Plaintiff alleges that he spoke to his case manager, defendant Liwag, on or about June 14,

15  2007. 3ACP at 11 ¶6.  Plaintiff explained his situation to Liwag and gave him a written Cop-Out

16  (request to staff) in which he outlined his safety concerns.  Id.  Liwag did not respond to the Cop-

17  Out.  Id.  After the investigation into the threat against Plaintiff was completed, and while Plaintiff

18  remained in Ad-Seg, Plaintiff's mother called defendant Liwag and spoke to him, reiterating

19  Plaintiff's safety concerns and pleading with him to transfer Plaintiff to another facility.  Id. at 13

20  ¶12.  Plaintiff's mother also wrote letters on Plaintiff's behalf to other Defendants in August and

21  September 2007, explaining Plaintiff's concerns, and these letters were sent down the chain of

22  command to defendant Liwag.  Id. at 13 ¶13.  Also in August 2007, Plaintiff sent another Cop-Out

23  to defendant Liwag, reminding Liwag of his safety concerns and inquiring about a possible transfer.

24  Id. at 14 ¶14.  Plaintiff filed a BP-9 administrative remedy form on September 14, 2007 with

25  defendants Liwag and Devere, explaining the seriousness of his request, but the BP-9 was rejected

26  on the same date, for Plaintiff's failure to attach a BP-8 form as required.  Id. at 18 ¶23.

27  ///

28

1    Thus, Plaintiff alleges that his case manager, defendant Liwag, was informed about his

2    situation on June 14, 2007, when Plaintiff gave Liwag a written request explaining his safety

3    concerns; in August and September 2007, when Plaintiff's mother spoke to Liwag and wrote letters

4    which made their way to Liwag; and on September 14, 2007, when Plaintiff submitted an

5    administrative remedy request to Liwag.

6    The Court finds that under these facts, a reasonable person in Liwag's position would not

7    have been aware that the law required him to act to further protect Plaintiff.  When Plaintiff first

8    spoke to Liwag in June 2007, the investigation was ongoing and Plaintiff was safely housed in Ad-

9    Seg.  Assuming that Liwag was again notified of Plaintiff's concerns in August and September 2007

10   by Plaintiff's mother and Plaintiff's administrative remedy request, Plaintiff does not allege that

11   Liwag knew about Plaintiff's encounters with inmate Mattox and other inmates on September 25 and

12   26, 2007.  A reasonable person, knowing that an investigation had been conducted which found no

13   verified threats, and not knowing about any subsequent threats, would not know that his failure to

14   act to further protect Plaintiff was unlawful.  Therefore, defendant Liwag is entitled to dismissal of

15   the Bivens claims against him, based on qualified immunity.

16   **Defendant Warden Dennis Smith**

17   Plaintiff alleges that on or about June 14, 2007, he spoke with Warden Smith and explained

18   his situation and concerns, including the fact that there was one Aryan Circle member from USP-

19   Pollock on the yard who could stir up trouble for Plaintiff.  3ACP at 11 ¶7; Willis Decl. at 32.

20   Warden Smith told Plaintiff that upon conclusion of the threat assessment investigation, a decision

21   concerning a possible transfer would be made.  3ACP at 11 ¶7.  On July 7, 2007, Plaintiff wrote a

22   letter to the Regional Director, Robert McFadden, hoping for assistance to be transferred, and a copy

23   of the letter was sent to Warden Smith.  Id. at 12 ¶9.  Warden Smith did not respond until August

24   13, 2007, when he stated that the investigation was completed, the threat was unverified, and

25   Plaintiff would be released from the SHU into the general population at USP-Atwater.  Id. at 12 ¶10.

26   Plaintiff then enlisted his mother's help to request a transfer.  Id. at 13 ¶12.  Plaintiff's mother wrote

27   a letter to Warden Smith sometime during August or September 2007, containing specific

28

1   information about the threat to Plaintiff. Id. at 13 ¶13.  Warden Smith was also sent copies of letters

2   Plaintiff's mother wrote to McFadden and Harley Lappin, Director of the Federal Bureau of Prisons,

3   and those letters were kept as records in Plaintiff's Central File. Id.  On August 16, 2007, Plaintiff

4   wrote Cop-Outs (written requests) to Warden Smith, stating his concerns about the results of the

5   investigation and conveying his fears and the history of his problems with the Aryan Circle prison

6   gang. Id. at 13 ¶15.   Plaintiff told Smith about his concerns that the investigation had not been

7   adequate, and his concerns that there was good communication between inmates at USP-Victorville,

8   where Plaintiff had been assaulted, and USP-Atwater, making it likely that Plaintiff would be in

9   danger. Willis Decl. at 32.  Smith responded that there were a lot of Victorville inmates on the yard

10  at USP-Atwater, but it was not known if any of those inmates were aware of Plaintiff's situation.

11  Id. at 32-33.  Plaintiff knew that the violence at USP-Atwater was out of control, with routine

12  assaults on inmates with sex charges, such as Plaintiff, and Warden Smith was aware of those

13  problems.  3ACP at 14 ¶16.

14      Thus, Plaintiff alleges that he informed Warden Smith about his fears and concerns by

15  speaking to him, writing him a letter, having his mother write a letter, and by the Warden receiving

16  letters written to others.  The only responses Plaintiff received were a statement that the investigation

17  was concluded and the threat to Plaintiff at USP-Atwater was unverified, and a response that there

18  were a lot of Victorville inmates on the yard.  Plaintiff also alleges that the Warden knew about the

19  out-of-control violence and assaults on prisoners with sex charges at USP-Atwater.

20      The Court finds that under these facts, a reasonable person in Warden Smith's position,

21  knowing that an investigation had been conducted and no threat against Plaintiff was verified, and

22  knowing that Plaintiff was being held in protective custody in the SHU, would not know there was

23  a risk of serious harm to Plaintiff if he did not act to further to protect Plaintiff.  Plaintiff does not

24  allege that the Warden knew about his encounters with inmate Mattox or any other specific threat

25  encountered by Plaintiff at USP-Atwater.  Under these circumstances, the Court cannot find that a

26  reasonable person in the Warden's position would know that his failure to act was unlawful.

27  ///

28

1    Therefore, defendant Warden Smith is entitled to dismissal of the <u>Bivens</u> claims against him, based

2    on qualified immunity.

3            **Defendant Unit Manager Devere**

4            Plaintiff alleges that in late June or early July of 2007 he spoke to his unit manager, defendant

5    Devere, and explained the exact nature of the threat against him. 3ACP at 11 ¶8. Defendant Devere

6    stated that he would contact SIS Lieutenant Cobb about the ongoing investigation into Plaintiff's

7    situation. <u>Id.</u> at 11-12 ¶8. Devere told Plaintiff he would be going on sick leave and that defendant

8    Bowles would be handling his caseload during his absence. <u>Id.</u> at 12 ¶8. After the investigation was

9    completed and while Plaintiff remained in Ad-Seg, Plaintiff's mother called defendant Devere and

10   spoke to him, reiterating Plaintiff's safety concerns and pleading with him to transfer Plaintiff to

11   another facility. <u>Id.</u> at 13 ¶12. Plaintiff's mother also wrote letters on his behalf to other Defendants

12   in August and September 2007, explaining Plaintiff's concerns, and these letters were sent down the

13   chain of command to defendant Devere. <u>Id.</u> at 13 ¶13. Plaintiff filed a BP-9 administrative remedy

14   form on September 14, 2007 with defendants Liwag and Devere, explaining the seriousness of his

15   request, but the BP-9 was rejected on the same date for Plaintiff's failure to attach a BP-8 form as

16   required. <u>Id.</u> at 18 ¶23. On September 25, 2007, Plaintiff was ordered to leave the SHU, which he

17   did under great duress. <u>Id.</u> at 19 ¶25. Plaintiff was placed in the General Population and was

18   approached by several gang members who told him that Kenneth Mattox was waiting to see him.

19   <u>Id.</u> Plaintiff met with Mattox without incident. <u>Id.</u> at 19 ¶26. On September 26, 2007, Plaintiff again

20   met with Mattox who was accompanied by six other inmates, including the "shot caller for the white

21   inmates" at USP-Atwater. <u>Id.</u> at 19 ¶27. Mattox told Plaintiff there were rumors he was a "RAPO"

22   [inmate with sex charges] and told him he had three weeks to produce paperwork to disprove it. <u>Id.</u>

23   at 19-20 ¶27. Immediately after the confrontation, Plaintiff spoke to defendant Devere, his unit

24   manager, and told him about the conversation with Mattox, which reaffirmed Plaintiff's belief that

25   his safety was in danger. <u>Id.</u> at 20 ¶28. Devere took no action to protect Plaintiff. <u>Id.</u> On October

26   9, 2007, Plaintiff was attacked and brutally assaulted by six inmates, while inmate Mattox acted as

27   a lookout. <u>Id.</u> at 20 ¶29.

28

Thus, Plaintiff alleges that he spoke to defendant Devere about his safety concerns and fears, and Devere knew about the investigation that was being conducted. After the investigation, Plaintiff's mother spoke to Devere and requested a transfer for Plaintiff due to safety concerns. Plaintiff also submitted an administrative remedy request to Devere, explaining the seriousness of his request, but it was rejected for procedural defects. Later, after Plaintiff encountered his enemy inmate, Kenneth Mattox, in General Population and was given a deadline by Mattox to prove he was not a "RAPO," Plaintiff spoke to Devere again and described the encounter, expressing his fears. Soon afterward, Plaintiff was assaulted by gang members associated with Mattox, while Mattox stood by.

Under these facts, the Court cannot find that a reasonable person in defendant Devere's position, knowing Plaintiff's fears and the history of Plaintiff's problems, knowing that Plaintiff's enemy inmate Mattox had approached Plaintiff on the yard accompanied by six other inmates who were gang members, knowing that Mattox had given Plaintiff a deadline to disprove that he was a "RAPO," would not know there was a risk of serious harm to Plaintiff in not acting to prevent Plaintiff's further release, unprotected, into the General Population with inmate Mattox or the inmates accompanying Mattox. Therefore, the Court finds that defendant Devere is not entitled to dismissal of the Bivens claims against him based on qualified immunity.

**Defendant Unit Manager Mrs. Bowles**

On August 17, 2007, while housed in the SHU after the investigation had concluded, Plaintiff wrote a Cop-Out to defendant Mrs. Bowles, in which Plaintiff explained in great detail about the "exact nature" of the threat that existed against him. Id. at 15 ¶17. Plaintiff told defendant Bowles about his known enemy Kenneth Mattox who was at USP-Atwater, and Bowles made a notation by writing Mattox's inmate number above his name on the Cop-Out. Id. at 16 ¶17. Defendant Bowles assured Plaintiff that she would personally look into this matter, but she never responded to the Cop-Out. Id. Plaintiff makes no further allegations against defendant Bowles.

Under these facts, the Court finds that a reasonable person in defendant Bowles' position, knowing that Plaintiff had an enemy at USP-Atwater but also knowing that Plaintiff was being held

in protective custody, would not know that her failure to act to further to protect Plaintiff was unlawful. Therefore, defendant Mrs. Bowles is entitled to dismissal of the <u>Bivens</u> claims against her, based on qualified immunity.

### Defendant Associate Warden Carolyn Gant

Plaintiff alleges that he spoke to defendant Associate Warden Gant on at least three different occasions, informing her of the exact nature of the threat against him. 3ACP at 16 ¶19. Pursuant to BOP policy, executive staff and department heads of an institution visit the SHU at least once a week, stopping at each cell door in order to discuss any problems that inmates in the SHU need to address. <u>Id.</u> It was during these weekly SHU visits that Plaintiff spoke to defendant Gant. <u>Id.</u>

Thus, Plaintiff alleges that while he was housed in the SHU, he told defendant Gant about his fears and concerns about the threats existing against him and the danger if he were released unprotected from the SHU among other inmates.

Under these facts, the Court finds that a reasonable person in defendant Gant's position, knowing about Plaintiff's fears and concerns for his safety, yet also knowing that Plaintiff was in protective custody while an investigation was being conducted, would not know that her failure to act to protect Plaintiff was unlawful and would place Plaintiff at risk of serious harm.   Therefore, defendant Associate Warden Carolyn Gant is entitled to dismissal of the <u>Bivens</u> claims against her, based on qualified immunity.

### Defendant Lieutenant Paul

Plaintiff alleges that on or about September 19, 2007, he spoke to the SHU Lieutenant Paul in Paul's office, at length and in great detail, about his safety concerns. 3ACP at 18 ¶24. Defendant Paul agreed that if the Plaintiff's allegations were true, Plaintiff "would be in danger in the general population at USP-Atwater." <u>Id.</u> at 18-19 ¶24. Plaintiff pleaded with defendant Paul to place him on Protective Custody Status. <u>Id.</u> However, Paul told Plaintiff he would be ordered to the General Population and if he refused the order, he would receive incident reports "for refusing to program." <u>Id.</u>

///

1    Thus, Plaintiff alleges that he told defendant Paul in great detail about his fears and pleaded

2    with defendant Paul to place him in protective custody.  However, although defendant Paul agreed

3    that Plaintiff would be in danger in the general population "if the threat against him was valid," Paul

4    told Plaintiff he would be released into the general population and would be punished if he refused.

5    Under these facts, the Court finds that a reasonable person in defendant Paul's position,

6    knowing Plaintiff's fears but not believing the threat against Plaintiff to be valid, would not know

7    that failing to place Plaintiff in protective custody was unlawful and would place Plaintiff at risk of

8    serious harm.  Therefore, defendant Lieutenant Paul is entitled to dismissal of the <u>Bivens</u> claims

9    against him, based on qualified immunity.

10    **Defendant Associate Warden Belinda Avalos**

11    Plaintiff alleges that his mother wrote letters to prison officials requesting a transfer for

12    Plaintiff, and she received a response from Associate Warden Belinda Avalos dated August 24,

13    2007, stating that the threat against Plaintiff had not been substantiated, but USP-Atwater staff

14    decided to seek a transfer for Plaintiff.  3ACP at 17 ¶20.  However, no such transfer occurred.  <u>Id.</u>

15    In September 2007, Plaintiff spoke to defendant Avalos and informed her that no one from the SIS

16    Department had interviewed him for the investigation or begun the paperwork for his transfer since

17    he was placed in the SHU.  <u>Id.</u> at 17 ¶21.  Plaintiff explained the threat against him and asked

18    defendant Avalos to reopen the investigation.  <u>Id.</u>  Avalos stated she would look into the matter, but

19    Plaintiff did not receive a transfer or a new investigation.  <u>Id.</u>

20    Thus, Plaintiff alleges that defendant Avalos knew about Plaintiff's fears, knew the results

21    of the investigation, knew Plaintiff was seeking a transfer, and knew Plaintiff had not been

22    interviewed by the SIS for the investigation.[5]

23    Under these facts, the Court finds that a reasonable person in defendant Avalos' position,

24    knowing that an investigation into the threat against Plaintiff had been conducted and no threat was

25    substantiated, would not know that her failure to order a new investigation or to arrange for

26

27    _____
     [5]The Court concurs with Defendants' argument that Plaintiff's complaints about the quality of the threat
     investigation are insufficient to state an Eighth Amendment claim and allege, at most, a claim for negligence.

28

Plaintiff's transfer was unlawful.  Therefore, defendant Avalos is entitled to dismissal of the <u>Bivens</u> claims against her, based on qualified immunity.

### C.   Rule 12(b)(5) - Insufficient Service of Process

Defendants argue that defendant Gant should be dismissed from this action based on Plaintiff's failure to effect service under Rule 12(b)(5).  In light of the Court's finding that defendant Gant should be dismissed from this action based on qualified immunity, the Court shall not consider Defendants' argument under Rule 12(b)(5).

## VI.   CONCLUSION AND RECOMMENDATIONS

Based on the foregoing, the Court finds that Defendants' motion to dismiss, filed on June 20, 2012, should be granted in part.  Accordingly, it is HEREBY RECOMMENDED that:

1.   Plaintiff's negligence claims against defendant United States be dismissed from this action for lack of subject matter jurisdiction, under the discretionary function exception of the Federal Tort Claims Act;

2.   Plaintiff's <u>Bivens</u> claims against defendants Warden Dennis Smith, Associate Warden Belinda Avalos, Lt. Cobb, Lt. Paul, Unit Manager Mrs. Bowles, Case Manager Liwag, and Associate Warden Carolyn Gant, for failure to protect Plaintiff under the Eighth Amendment, be dismissed from this action based on qualified immunity;

4.   Defendants United States, Smith, Avalos, Cobb, Paul, Bowles, Liwag, and Gant be dismissed from this action based on Plaintiff's failure to state any claims against them; and

3.   This case now proceed only against defendant Unit Manager Devere, on Plaintiff's <u>Bivens</u> claims, for failure to protect Plaintiff under the Eighth Amendment.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within **thirty (30) days** after being served with these Findings and Recommendations, any party may file written objections with the court.  The document should be captioned "Objections to Magistrate Judge's

Findings and Recommendations." The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated:**   **October 16, 2012**                    **/s/ Gary S. Austin**
                                                     UNITED STATES MAGISTRATE JUDGE